UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SAMANTHA NEWELL,

                Plaintiff,

v.                                       Case No. 19-11988
                                       Honorable Thomas L. Ludington

CENTRAL MICHIGAN UNIVERSITY
BOARD OF TRUSTEES,

                Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

      Plaintiff, Samantha Newell, is a graduate student at Central Michigan University's

("CMU") Physical Therapy Program. ECF No. 14 at PageID.139. She was accepted into the early

decision program and began taking classes in May of 2016. *Id*. at PageID.139 Plaintiff completed

the academic coursework with a 3.67 GPA. *Id*. at PageID.152. Plaintiff alleges she is on medical

leave due to injuries she sustained during the winter/spring semester of 2017. She plans to return

to finish her clinical requirements when her injuries are healed. ECF No. 14 at PageID.152-153.

      On July 3, 2019, Plaintiff filed a complaint against Defendants alleging CMU violated the

ADA and the Rehabilitation Act by failing to grant her reasonable accommodations, committed

retaliatory harassment and interference, created a hostile educational environment, and violated

the Michigan Persons with Disabilities Civil Rights Act ("PDCRA"). ECF No. 1. She also alleges

that Defendant Dr. Silkwood-Sherer violated her constitutional right to bodily integrity. *Id.* A

second amended complaint was filed on October 2, 2019 and Plaintiff dismissed the PDCRA

claim. ECF No. 14. On May 18, 2020, Defendant Silkwood-Sherer's motion to dismiss was

granted and Count V was dismissed. On May 21, 2020 Defendant CMU filed a motion for

summary judgment and the response and reply were subsequently filed. ECF No. 39, 47, 50.

# I.

## A.

Plaintiff has two conditions that, according to her, reflect the symptoms of hypnotic cerebral palsy and a rare form of Marfan syndrome. ECF No. 14 at PageID.139. The conditions associated with her cerebral palsy are hypermobility/hyperflexibility, joint instability and pain, hypotonia, weakness, anatomical abnormalities, learning and cognitive disabilities, and sensory processing issues. ECF No. 14 at PageID.139. As a result, she has difficulty with her respiratory and musculoskeletal systems, cognitive and sensory functions, and ability to perform vigorous or taxing physical activities and manual tasks. *Id*. at PageID.139. Plaintiff struggles with her mental processing speed (below the 10th percentile). ECF No. 47-13 at PageID.3673. In a letter to her professors, Plaintiff included a note from her doctor stating "her processing speed issues always keep her 'a beat late' and it is mentally exhausting for her to try to keep up the pace with the professor and her classmates during the discussion time." *Id*. at PageID.3763. However, Plaintiff has been academically successful and performs at or above satisfactory levels in all her classes. *Id*. at PageID.3763.

Plaintiff alleges in her amended complaint that before being accepted into the physical therapy program she met with program director Dr. Silkwood-Sherer about her condition and that it was the subject of her application essay. *Id*. at PageID.140. Silkwood-Sherer believed Plaintiff's disability was mild after meeting with her the first time. ECF No. 45-3 at PageID.2924. Plaintiff claims that because of this meeting and her essay, CMU was aware of her condition and her need for accommodations before she was accepted. ECF No. 14 at PageID.140. However, Plaintiff alleges that CMU never asked her to undergo a physical exam or evaluation. *Id*. at PageID.140. The physical therapy program's student handbook states:

> Students who have a disability that requires accommodations to participate in class activities or meet course requirements should register with the Office of Student Disability Services . . . . The staff of that office will help determine what accommodations need to be made to assist the student. The Office of Student Disability Services will then inform the faculty members of the accommodations needed and assist them in obtaining the needed resources. *Id*. at PageID.140-141.

Plaintiff's complaint states that she registered with the Office of Student Disability Services (SDS) and provided them with the appropriate documentation before the start of classes in 2016. ECF No. 47 at PageID.3415. Plaintiff was granted accommodations including provisions for time and a half on tests and a private testing room. *Id*. at PageID.141. Plaintiff was also approved to live in campus housing for students with disabilities. *Id*. at PageID.141. Plaintiff was given accommodation letters which she was responsible for providing to her professors. ECF No. 39-2 at PageID.1575.

## B.

Plaintiff began her program in May 2016. ECF No. 39-6 at PageID.1725. On May 24, 2016, Plaintiff did not provide Dr. Samson with her accommodation letter until the night before the exam. *Id*. at PageID.1643. This caused Dr. Samson to find a quiet room for her to take the test, at the last minute. *Id*. at PageID.1725. Plaintiff testified that she forgot about providing the letters to her professors. ECF No. 39-2 at PageID.1645. Plaintiff further testified that, in her opinion, Dr. Samson was not retaliating or creating a hostile education environment by bringing up the incident at a faculty meeting. *Id*. at PageID.1646.

During the fall 2016 semester Plaintiff had several attendance issues. On October 17, 2016, Plaintiff arrived fifty minutes late to Dr. Andraka's exam. ECF No. 39-6 at PageID.1725. Plaintiff acknowledged that her late arrival reflected poorly on her professionalism. ECF No. 39-2 at PageID.1648. Plaintiff does not believe that Dr. Andraka was retaliating by bringing up the incident in the October faculty meeting. *Id*. at PageID.1648. In November 2016, Plaintiff forgot to

attend a laboratory session with Dr. Andraka. ECF No. 39-6 at PageID.1725. Plaintiff offered no explanation why she forgot to attend class. ECF. No 39-2 at PageID.1651. Plaintiff testified that she did not believe Dr. Andraka retaliated against her by bringing up the incident at the faculty meeting. *Id.* at PageID.1651.

Also during the fall 2016 semester, Plaintiff took Patient Care Lab I, a required course taught by Dr. Timothy Zipple and Dr. Elaine Betts. ECF No. 14 at PageID.141. As part of the course Plaintiff was required to experience electronic stimulation ("e-stim"). *Id.* at PageID.141. E-stim is a treatment method that uses a mild electric current to treat muscle spasms, pain, and nerve damage. ECF No. 39-2 at PageID.1577. Plaintiff contends that as a result of e-stim she experienced "headaches, fatigue, confusion, inability to concentrate, insomnia, lack of appetite, memory problems, executive fiction issues, amplified emotions due to her preexisting sensory processing issues related to her disorder." ECF No. 14 at PageID.141.

L'Hommedieu, the director for SDS, set up a meeting between Plaintiff, Silkwood-Sherer, and herself for November 22, 2016 to discuss the practical final exam for Patient Care I. ECF No. 39-2 at PageID.1589, 1595. At that meeting it was decided that during the practical final exam Plaintiff's partner would only set up the machine but not turn it on. *Id.* at PageID.1595. Plaintiff did not experience further e-stim. *Id.* at PageID.1606. Plaintiff acknowledges that the events surrounding the application of e-stim are not the basis for her complaint. ECF No. 47 at PageID.3417.

On December 22, 2016, L'Hommedieu sent Plaintiff an email regarding the upcoming spring semester. ECF No. 47-12 at PageID.3668. L'Hommedieu explained

> Now that Fall semester is finished I wanted to touch base with you regarding how to work out your accommodations in Spring and forward. I've found that including me in the discussion with your professors and Dr. Silkwood-Sherer really doesn't help. I don't understand enough about the program and they are adept at working

through students' issues while maintaining the standards necessary to assure students are able to work effectively post-graduation. I think in the future it will be best for you to go directly to your professors and include Dr. Silkwood-Sherer on e-mails. Including me means they have to teach me what is required to function in the program. So far they have been able to work out what you need and I anticipate that will continue in the future. *Id.*

### C.

On January 5, 2017, Plaintiff and her mother wrote a letter to her professors. She began the

letter stating

I suspect many of you have questions about some experiences you've had with me either in lectures or labs over the last semester. I would like to do my best to explain my challenges, communicate my needs, and ask for your help. I worry about being misunderstood or having you come to inaccurate conclusions about me. I really love this program and want to do very well. ECF No. 47-14 at PageID.3673.

Plaintiff explained she recently met with her neuro-psychologist to discuss potential

accommodations. *Id.* Specifically, the letter requests noise cancelling headphones during testing,

modified attendance requirements, a note taker, access to the lectures before class, video

recordings of the labs, additional time with the professor, more time to formulate answers during

group work, and changes to physical treatments and modalities that were harmful to her. ECF No.

47-14 at PageID.3673-3675, ECF No. 39-2 at PageID.1613-1614.

Seventeen physical therapy program professors and staff, including Silkwood-Sherer, Dr.

Zipple, and L'Hommedieu, discussed Plaintiff's requests at their staff meeting on January 17,

2017. ECF No. 47-15 at PageID.3676. They denied her request for a modified attendance policy

and that she be excused from having physical treatments performed on her in class. *Id.* at

PageID.3676-3677. It is unclear from the record if she was allowed to use noise cancelling

headphones. ECF No. 47-16 at PageID.3680.  The professors granted some accommodations,

denied several of her requests, and discussed ways to make Plaintiff successful without the requests

that were denied. *Id.* at PageID.3680. These strategies and alternative accommodations included:

reviewing available material before class, getting recorded material from the previous year, letting her use earplugs during written exams, not overworking her joints, and giving her positive feedback. *Id*.

Staff also decided that Plaintiff's physical therapy advisor Jan Perkins would create a professional behavior contract for Plaintiff to sign. ECF No. 47-15 at PageID.3677. The program staff noted several behaviors they were concerned about including:

> ii.   Student does not self-assess well. She feels that she is below her classmates. She worries about things that have not happened, yet.
> iii.  Student has not followed up on exercises that were given to her by Dr. Haines to improve her strength and ability to work safely with patients.
> iv.   Student has only met with her advisor once since entering the program.
> v.    Student has not followed up with Dr. Zipple on an email that he sent her.
> vi.   Student has not given Dr. Betts a letter from Student Disability Student Services this semester
> vii.  Dr. Betts told student that she would work with her biomechanics[;] student did not follow through. *Id*. at PageID.3677.

The plan included weekly meetings with Perkins, mandatory class attendance, full participation in labs, no accommodations that will disturb or endanger other students, and required Plaintiff to look into a bone conductor cap in place of headphones, sign up for a class schedule that includes a break between class and labs, meet with a professor once a week during office hours, and supply a letter from SDS to her professors every semester to keep them informed of any changes in accommodation. *Id*. at PageID.3677.

### D.

Despite the accommodations and the signed professionalism plan, Plaintiff struggled during the winter 2017 semester. In her complaint, Plaintiff alleges that as a result of the joint mobilizations, stretches, and other treatments performed on her in class between January and April of 2017 she suffered significant injury. ECF No. 14 at PageID.145. The alleged injuries include:

a. Injuries to her hips, including bilateral partial tears of the hip labra and psoas

tendonitis, requiring surgical repair and causing early osteo-arthritis
b. Aggravation of previous soft tissue, ligament, and tendon injuries to her shoulders and increased instability;
c. An ankle sprain;
d. Muscle spasms and guarding due to thoracic mobilizations;
e. Injury to her wrists causing permanent increased instability, requiring Plaintiff to wear wrist braces for any strenuous activity in the future; and
f. Other soft tissue damage causing polyarthralgia in her wrists, ankles, knees, spine, and shoulders. *Id*. at PageID.145-146

During February and March Plaintiff had several attendance issues. On February 14, 2017, Plaintiff arrived one hour late to her test despite it being scheduled for six weeks. ECF No. 39-2 at PageID.1653. Plaintiff testified in her deposition that she was not discriminated against for the February 14, 2017 attendance issue saying:

Q. February 14th, that's six weeks into the semester, right?
**A. Yes.**
Q. So you should have had your schedule down by then, right?
**A. Yes.**
Q. You agree?
**A. Yes.**
Q. You agree this is something that a faculty member might be concerned about, correct?
**A. Yes.**
Q. Was Dr. Andraka retaliating against you in this e-mail
**A. Dr. Andraka was always very kind and very supportive of me.**
Q. So no discrimination at all in this e-mail. I'm sorry I cut you off.
**A. I've never had any concerns with him at all. He was very supportive of me**
Q. Okay. So this e-mail's not discrimination
**A. No….**
Q. Here's another faculty minute -- more faculty minutes from a faculty meeting of February 14, 2017. Let's turn to the next page, CMU 00057 at the bottom corner.
**A. Yeah.**
Q. SN showed up for John's class one hour late with no explanation to her tardiness, right?
**A. Yes.**
Q. Something Andraka reported to the faculty on that day, apparently.
**A. Looks like it.**
Q. Not discriminatory conduct against you.
**A. No.** ECF No. 39-2 at PageID.1653-1654.

On February 26, 2017, Plaintiff scheduled two tests at the same time. *Id*. at PageID.1655. Plaintiff later admitted that she made a mistake when she arranged for two tests at the same time on February 26, 2017. *Id*. at PageID.1656. On March 1, 2017, Plaintiff scheduled an evening exam despite the location where she took exams, the SDS office, being closed at 5 p.m. *Id*. at PageID.1726. Plaintiff did not raise this issue with her instructor until the night before her exam. *Id*.

On March 7, 2017, Perkins sent Plaintiff an email regarding class expectations and the need to meet. ECF No. 47-25 at PageID.3696. Plaintiff responded agreeing that a meeting was a good idea and that her mother wanted a disability attorney present at the meeting. *Id*. at PageID.3696. Plaintiff also acknowledged in her email that she knew the meeting was about program expectations but that she wanted to discuss "quite a few disability accommodations expectations" as well. ECF No. 46-25 at PageID.3696.

On March 15, 2017, before the scheduled meeting, Plaintiff emailed her professors and requested that she be excused from performing physical treatments in class because they were contraindicated for her condition and causing her harm. ECF No. 47-17 at PageID.3682. Plaintiff's email stated:

> I would like to clarify something with all of you. I am understanding that although I have a medical diagnosis of hypermobility and hypotonia, I am still expected to endure mobilizations. I've asked several of you about this and I get the same answer, which is that if done mildly, it will be fine. This doesn't seem right to me, given that my condition is one of the contraindications to using it…. ECF No.47-17 at PageID.3682.

Silkwood-Sherer responded on behalf of the professors replying that the mobilizations were not contraindicated if done correctly and that they were a required part of the program. ECF No. 47-18 at PageID.3683. Plaintiff's email to the faculty did not allege that any injuries occurred from the mobilizations. *Id*. at PageID.3682. Silkwood-Sherer also reinforced the need for Plaintiff and

the professors to meet in person to keep the dialogue open and to better address Plaintiff's concerns. *Id.* at PageID.3683.

Plaintiff met with Silkwood-Sherer, Perkins, and L'Hommedieu on March 28, 2017 regarding her professionalism and desire for accommodations. ECF No. 47-27 at PageID.3698. Perkins testified that the primary focus of the meeting was Plaintiff's attendance. ECF No. 35-10 at PageID.1270. Silkwood-Sherer explained staff's concerns about Plaintiff's professionalism at the meeting:

> Dr. Deb: Well the problem was that was the second one [second exam scheduling issue] so both times you saying you forgot . . . that . . . becomes the beginning of a pattern to stop before it continues. Granted there might have been legit reasons for both, but what you said to use looked like a pattern of you not paying attention to your schedule. We are concerned that it will happen later in the clinic. *Id.* at PageID.3701.

Plaintiff was given a written warning for her professionalism issues. *Id.* at PageID.3709-3710. Plaintiff was upset and stated that she did not believe she had been heard for the few months before the meeting. *Id.* at PageID.3709. Plaintiff was not allowed to bring her attorney to the meeting. *Id.* at PageID.3706. Plaintiff was told that L'Hommedieu was at the meeting to advocate for her and could help her create accommodations that were legal and in compliance with the physical therapy program requirements. *Id.* at PageID.3706.  During the meeting, Dr. Silkwood-Sherer commented that demanding accommodations without being willing to compromise could cause difficulty for her as she enters the workforce. ECF No. 45-29 at PageID.3352. Plaintiff alleges in her complaint that she stopped seeking accommodations "[d]ue to the pending disciplinary action." ECF No. 14 at PageID.147.

### E.

In addition to Plaintiff's concerns regarding the mobilizations in class and her professor's professionalism concerns, Plaintiff alleges that she was assigned to a clinical site in Spring of 2017

that required heavy patient lifting, that she received no accommodations at the clinical site, and that she was not allowed to tell those responsible for the site about her disability or need for accommodations. ECF No. 14 at PageID.150. Plaintiff further alleges that, because of the injuries sustained in class, she struggled to perform at the clinical site, was harassed by the employees for her lack of strength, and her clinical experience was terminated. *Id*. at PageID.151.

Plaintiff further alleges that in the spring and summer of 2017 she continued to have difficulty obtaining accommodations. ECF No. 14 at PageID.150.  Dr. Zipple taught Plaintiff's Manual Therapy I class during summer of 2017. ECF No. 35-2 at PageID.1104. Despite Plaintiff's allegations, on July 7,  2017, Zipple gave Plaintiff a letter granting her requested accommodations including (1) the ability to choose what mobilizations she would have performed on her, (2) the ability to record professors demonstration of mobilization techniques, (3) the ability to take quizzes in the HPB building instead of the SDS office, and (4) being given seven minutes to demonstrate techniques during a practical exams rather than four. ECF No. 47-30 at PageID.3720. Under the accommodation allowing Plaintiff to not receive mobilizations she deemed hazardous the letter stated:

> It is the student's responsibility to inform her lab partner each day that he or she will have to practice the manual therapy techniques on the classmates at an adjacent lab table during each session. She will independently solicit help from other students at adjacent tables and participation by these classmates is strictly voluntary.
> *Id*. at PageID.1795.

Plaintiff did not sign the accommodation letter, instead writing "I have been given this to review." ECF No. 39-10 at PageID.1795. She was concerned that if she signed the document and her class partner refused to practice mobilizations on someone else, that she would be forced to have mobilizations practiced on her. ECF No. 35-2 at PageID.1106. Plaintiff later testified that no student refused the request. *Id*. at PageID.1106.

**F.**

In April 2017, Plaintiff and her mother met with Dave Brittain, the director of CMU's Office for Civil Rights and Institutional Equality (OCRIE). ECF No. 35-2 at PageID.1089. Plaintiff alleges an OCRIE investigation was conducted between April 6 to July 7, 2017. Dr. Silkwood Sherer emailed Plaintiff instructing her that she should not meet with professors to discuss class specific accommodations while OCRIE was reviewing the situation and drafting a universal set of accommodations. ECF No. 47-29 at PageID.3719. Neither party provided copies of the OCRIE report or any investigatory documents to the Court.

Plaintiff alleges that she met with OCRIE, SDS, and Silkwood-Sherer on July 10, 2017 to again discuss requested accommodations. ECF No. 14 at PageID.151. Plaintiff recorded this meeting without requesting permission from the other participants. ECF No. 45-2 at PageID.1103. Plaintiff alleges that at the meeting she requested that she be able to observe a potential clinical setting to determine if she would be able to work there and that the request was denied by Silkwood-Sherer. *Id.* at PageID.151. However, as the accommodation letter was not included as an exhibit, the assertion is uncorroborated.

As a result of the investigation, the formal written warning against Plaintiff was withdrawn. ECF No. 47-32 at PageID.3723. Plaintiff admits that as a result of the meetings with the OCRIE and her professors, she no longer was required to participate in mobilizations during lab sessions. The formal accommodation letter was issued July 11, 2017. ECF No. 35-2 at PageID.1103. Silkwood-Sherer objected to the accommodations stating "I don't like it, but obviously will have to live with it. Just want that on the record." ECF No. 47-31 at PageID.4722.

## G.

Plaintiff alleges that she continued to be successful in the program during 2017-2018 year with accommodations. ECF No 14 at PageID.152. Plaintiff claims that she completed the coursework required with a 3.67 GPA. *Id*. at PageID.152. Plaintiff alleges she is on medical leave due to her injuries from the winter/spring of 2017 and plans to return to finish her clinical requirements when she is healed. *Id*. at PageID.152-153.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. As the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act share the same remedies, procedures, and rights, Plaintiff's claims brought under both statutes may and will be analyzed together. *Thompson v. Williamson Cty.,* 219 F.3d 555, 557 (6th Cir. 2000).

## III.

## A.

The Eleventh Amendment states "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI. The Supreme Court has interpreted this as granting states sovereign immunity from lawsuits brought by private citizens. *Nihiser v. Ohio E.P.A.*, 269 F.3d 626, 627–28 (6th Cir. 2001). Immunity can be lost by waiver or Congressional abrogation. *Id*. The Sixth Circuit has stated that "Eleventh Amendment immunity 'bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments, by citizens of another state, foreigners or its own citizens.'" *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (quoting *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th Cir. 1993)).

Defendant acknowledges that it waived its sovereign immunity to claims arising under the Rehabilitation Act by receiving federal funds. ECF No. 39 at PageID.1567. However, Defendant argues that it is still entitled to sovereign immunity from Plaintiff's ADA claims. *Id.*

Plaintiff argues that Defendant is barred from receiving immunity for both the ADA and Rehabilitation Act claims for two reasons. ECF No. 47 at PageID.3441. First, Plaintiff claims that sovereign immunity does not protect CMU because it violated both Title II and the Fourteenth Amendment. *Id.* at PageID.3442. Second, Plaintiff claims that Congress validly abrogated Eleventh Amendment immunity for Title II claims of discrimination in public higher education. *Id.* at PageID.3442.

The Title II claim will be analyzed first. The Sixth Circuit has not addressed the abrogation of Eleventh Amendment immunity in higher public education. However, District Court Judge

Zouhary from the Northern Division of Ohio applied the analysis outlined by the U.S. Supreme Court for Title II cases in *Tennessee v. Lane* and applied by the First Circuit in *Toledo v. Sanchez,* 454 F.3d 24 (1st Cir. 2006). *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475 (N.D. Ohio 2007). In *Frank v. University of Toledo*, a disabled student working in a Ph.D. program sued the University of Toledo for *inter alia* failure to accommodate, retaliation under the ADA and discrimination based on disability. *Frank v. Univ. of Toledo*, 621 F. Supp. 2d 475, 478–81 (N.D. Ohio 2007). Plaintiff was granted accommodations for parking and adaptive technology to help improve his typing ability. He completed his coursework and minor comprehensive exam without the use of the typing accommodation. *Id.* Plaintiff then took his major comprehensive final without accommodations and failed. *Id.* Defendant offered him the opportunity to retake the exam with a number of accommodations, but plaintiff refused stating that they were inadequate or not all the accommodations he was allotted. *Id.* As he did not pass the exam, plaintiff was unable to complete his Ph.D. and also lost a teaching job as a result. *Id.* The factors analyzed by the court include "(1) the constitutional right Congress sought to protect; (2) any history of constitutional violations justifying enactment of prophylactic legislation; and (3) whether the law is a congruent and proportional response to these violations." *Id.* at 481.

Applying *Toledo v. Sanchez*, the court in *Frank* found that Congress attempted to protect equal protection and due process rights for disabled students' access to public education because of a documented pattern of violations of those rights in public education. *Id.* It also found Title II was congruent and proportional to the pattern of violations because it required only reasonable accommodations, not foundational changes to programs. *Id.* By extension, the *Frank* court held that Congress abrogated Eleventh Amendment immunity with respect to Title II discrimination claims in higher education. This reasoning is persuasive, and the facts of the present case are

sufficiently similar to bring it under the umbrella of *Frank*, *Toledo*, and *Tennessee*. Both Plaintiff and the *Frank* plaintiff were disabled students within public higher education seeking accommodations to help them complete course requirements. Plaintiff sought accommodations to execute practical labs and exams without injury; the *Frank* plaintiff sought accommodations to execute written exams sufficiently with typing assistance. Congress validly abrogated Eleventh Amendment immunity for Title II discrimination claims in higher education. CMU is not entitled to immunity from claims arising out of Title II claims.

## IV.

In Count I, Plaintiff alleges Defendants' failed to grant her reasonable accommodations. ECF No. 14 at PageID.153. Specifically, the amended complaint alleges that CMU knew of Plaintiff's disability, that Plaintiff's requests would not have fundamentally altered the nature of the program or caused CMU an undue financial burden, and that CMU failed to meaningfully engage in the interactive process to identify appropriate accommodations. *Id*.

CMU knew of Plaintiff's disability because Plaintiff began her program with an initial set of accommodations. ECF No.14 at PageID.140. Since Defendant granted Plaintiff accommodations, Plaintiff's may only recover if either (1) CMU failed to meaningfully engage in the interactive process to identify appropriate accommodations or (2) the delay with which Plaintiff received her accommodations was so significant that it constituted a constructive denial of the accommodations. Each alternative for recovery will be analyzed separately.

## A.

When requesting accommodations, a student carries the burden of demonstrating that the accommodations are reasonable and that she is "otherwise qualified," meaning she can meet the program requirements with reasonable accommodations. *Shaikh v. Lincoln Mem'l Univ.*, 46 F.

Supp. 3d 775, 782 (E.D. Tenn. 2014), *aff'd*, 608 F. App'x 349 (6th Cir. 2015). In response, a school has a duty to provide accommodations that are reasonable, but the duty "does not require an educational institute lower or to effect substantial modifications of standards to accommodate a handicapped person." *Id.* A modification may be unreasonable if it requires undue financial or administrative burden or fundamentally alters the nature of the program. *Id.*

An example of an unreasonable accommodation within an academic setting is provided in *Southeastern Community College v. Davis. Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397 (1979). In *Southeastern*, a nursing school applicant was denied admission into the nursing program because of a hearing disability that would have created an unsafe working environment. *Southeastern Cmty. Coll. v. Davis*, 442 U.S. 397, 400–04 (1979). The U.S. Supreme Court held that the accommodations required to allow her to complete the program would constitute a major change in the requirements. *Id.*

> Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is "reasonable on its face . . . or if the defendant establishes as a matter of law that the proposed modification will cause undue hardship in the particular circumstances.
>
> *Shaikh*, 46 F. Supp. 3d at 783.

Once an accommodation is requested, the school has a duty to engage in the interactive process: a series of informal meetings and discussions to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Melange v. City of Ctr. Line*, 482 F. App'x 81, 84–85 (6th Cir. 2012) (quoting *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007)). A school's failure to participate in the interactive process is actionable if the student demonstrates that 1) the school knew about the student's disability, 2) the student requested accommodations, 3) the school did not show good

faith in seeking appropriate accommodations, and 4) appropriate accommodations could have been provided but for the school's lack of good faith. *Clark v. Whirlpool Corp.*, 109 F. App'x 750, 755 (6th Cir. 2004). Evidence of good faith arises when the school provides alternative accommodations in response to a student's request or readily meets with the student to discuss the request. *Edmunds v. Bd. of Control of East Michigan Univ.*, WL 5171794, at *6 (E.D. Mich. Dec. 23, 2009).

Here, CMU knew of Plaintiff's disability. She requested additional accommodations in November 2016, January 5, 2017, and March 15, 2017. ECF No.14 at PageID.141; ECF No. 47-14 at PageID.3673; and ECF No. 47-17 at PageID.3682. CMU responded to Plaintiff's November 2016 request to stop e-stim participation with a meeting on November 26, 2016, after which e-stim was not performed or required on the final exam. ECF No.39-2 at PageID.1589, 1595. CMU responded to the set of accommodations requested January 6, 2017 with a staff meeting on January 17, 2017. From the meeting, CMU denied Plaintiff's request for modified attendance requirements but provided alternatives to Plaintiff's other requests: earplugs in lieu of noise cancelling headphones, lecture recordings from previous years in lieu of early access to slides, and not overworking her joints in lieu of nonparticipation in treatment labs. ECF No. 47-16 at PageID.3680. CMU responded to Plaintiff's request on March 15, 2017 to stop enduring mobilizations as practiced on other students with an interactive process meeting on March 28, 2017. ECF No.47-27 at PageID.3698. During the meeting, CMU included a staff member to act as Plaintiff's advocate, and Plaintiff was permitted to bring future advocates of her choosing, provided they were not a lawyer. *Id*.

The first two criteria of the test established in *Clark* are met: CMU knew about Plaintiff's disability and Plaintiff's requested accommodations. However, the third and fourth prongs are not

met because CMU demonstrated good faith by readily responding to Plaintiff's requests with scheduled meetings consistent with the interactive process and consistently provided alternative accommodations when denying Plaintiff's requests. *See Edmunds*, WL 5171794, at *6. The third and fourth criteria of the test outlined in *Clark* require the absence of good faith by the school. *Clark*, 109 F. App'x at 755. Since CMU has demonstrated good faith, Plaintiff is unable to succeed in a claim of failure to engage in the interactive process.

## B.

The second test for failure to accommodate is if CMU constructively denied Plaintiff's request for accommodation by unreasonable delay. *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 437 (6th Cir. 1998). However, a delay in providing a requested accommodation is not actionable when it results from "internal processing or to events outside the [program's] control. *Gerton v. Verizon S. Inc.*, 145 Fed. Appx. 159, 168 (6th Cir. Aug.18, 2005).

To evaluate delay, several District Court Judges within the Sixth Circuit have developed their own tests. To find delay actionable, Judge Bell found that a plaintiff needed to prove 1) a defendant knew or should have known their obligations under the ADA and Rehabilitation Act and disregarded such obligation, 2) the defendant "outright denied multiple requests" rather than engage in the interactive process, and 3) defendant only received subsequent accommodation "due to legal pressure." *Velzen v. Grand Valley State Univ.*, 902 F. Supp. 2d 1038, 1046 (W.D. Mich. 2012) ("If Plaintiffs can prove all of these facts, then Velzen would be entitled to compensatory damages"). Judge Duggan developed a four factor test for evaluating delay which considers 1) length of delay, 2) reasons for delay, 3) whether alternative accommodations were provided while initial accommodation requests were being considered, and 4) evidence of good faith. *Edmunds*, WL 5171794, at *5-6. Drawing an outer bound for Judge Duggan's analysis of delay, Judge Rice

found when an accommodation is granted with such delay that the accommodation is rendered "useless," the delay constitutes a constructive denial. *Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, WL 1331311, at *22 (S.D. Ohio Mar. 25, 2019). However, Judge Rice also found a delay not to be actionable when a student requests an accommodation late into the semester, even if a school does not begin interactive process meetings until near the end of the semester. *Cox v. Univ. of Dayton*, WL 1233822, at *5 (S.D. Ohio Mar. 13, 2020). Judge Lioli commented on Judge Rice's definition of constructive denial, stating that there is no constructive denial when any delay in plaintiff's receipt of their requested accommodation is "*de minimis* and did not [] prevent the accommodation from occurring." *Kaminsky v. Wilkie,* WL 3893521, at *12 (N.D. Ohio July 10, 2020). As Judges Rice and Lioli have adopted and expanded upon Judge Duggan's factors test to develop a definition of constructive delay, his test will be adopted for analysis.

Plaintiff contends that CMU constructively denied her requests made in January and March since a final set of accommodations were not provided until after her Patient Care II course was complete. ECF No. 47 at PageID.3428. CMU argues that a constructive denial did not occur because CMU provided alternatives to most of the accommodations requested and the accommodations granted after Plaintiff completed Patient Care II were still of value because they were used in Plaintiff's completion of Manual Therapy I & II. ECF No. 50 at PageID.3755.

In this case, the longest delay between Plaintiff's request and CMU's accommodation was four months. According to Judge Duggan, three months was a "limited delay." *Edmunds*, WL 5171794, at *6. Here, the reasons for delay were because Plaintiff did not respond to CMU staff's requests to schedule in person meetings, when Plaintiff did respond she did not request an immediate meeting, and CMU staff encouraged Plaintiff to discuss accommodations with

professors in person rather than in email. ECF No. 35-14 at PageID.1425; ECF No. 35-15 at PageID.1427. CMU demonstrated good faith by providing multiple alternative accommodations and readily meeting with the Plaintiff during the interactive process. ECF No. 29-5 at PageID.739-740; ECF 35-13 at PageID.1379; ECF No. 35-21 at PageID.1483.

CMU's provision for accommodations in July does not amount to a constructive denial. The accommodation was not "useless" to Plaintiff because Plaintiff could use the accommodations for later courses at CMU. Since Plaintiff used the reasonable accommodations during two of her later courses, the delay did not prevent the accommodation from occurring.

### C.

For Defendant to succeed in its Motion for Summary Judgment, it needed to show that there was no genuine issue of material fact that (1) CMU meaningfully engaged in the interactive process to identify appropriate accommodations or (2) the delay with which Plaintiff received her accommodations was not large enough to constitute a constructive denial. Defendant has met this burden and is entitled to summary judgment. Therefore, Defendant's Motion for Summary Judgment on Count I will be granted.

### V.

In Count II, Plaintiff alleges retaliatory harassment under the ADA and Rehabilitation Act. ECF No. 14 at PageID.159. Plaintiff's complaint states that she engaged in protected activity under the ADA by requesting accommodations. *Id*. at PageID.159.  Plaintiff believes that CMU through Silkwood-Sherer "engaged in severe and/or pervasive harassing conduct in retaliation for Plaintiff's exercise of a protected activity . . . ." *Id*. at PageID.159.

To succeed on this count, Plaintiff must establish that: (1) she engaged in activity protected under Section 504 and the ADA; (2) CMU knew of this protected activity; (3) CMU then took

adverse action against Plaintiffs; and (4) there was a causal connection between the protected activity and the adverse action. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013). A causal connection arises only when there is "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). An adverse action arises when a reasonable person "well might have [been] dissuaded . . . from making or supporting a charge of discrimination." *Burlington North & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Negative evaluations of performance or conduct are not actionable adverse actions which support a retaliation claim. *See Hurston v. Butler Cty. Dep't of Jobs & Family Servs.*, WL 2416566, at *4 (S.D. Ohio Sept. 30, 2005); *Primes v. Reno*, 190 F.3d 765, 766–67 (6th Cir. 1999).

Here, the first two elements are met: Plaintiff was engaged in protected activity (requesting reasonable accommodations). *See A.C. ex rel. J.C.*, 711 F.3d at 699; *Gardner v. West Kentucky Univ.*, WL 5299451, at *4 (W.D. Ky. Sept. 9, 2015). CMU knew about the activity. Plaintiff alleges that CMU committed an adverse action in holding a disciplinary meeting with her and asking her to sign a professional behavior contract. ECF No. 47-8 at PageID.3523. However, Plaintiff continued to seek accommodations after being given the contract. *Id*. Therefore, CMU's implementation of the professional behavior contract was not an adverse action, as it did not dissuade Plaintiff from continuing her protected activity. Further, there was no causal connection between Plaintiff's protected activity and the professional behavior contract. Plaintiff conceded that the six concerns regarding her professionalism, or lack thereof, raised during staff meetings were not retaliatory. The meeting was originally scheduled to discuss Plaintiff's professional misconduct and issue the professional behavior contract. It was Plaintiff who asked to speak about her accommodations during the same meeting. Therefore, CMU has met its burden to show there

is no issue of genuine material fact that CMU's provision for a professional behavior contract 1) would not dissuade a reasonable person from continuing a protected activity and 2) is not linked to Plaintiff's protected activity. Defendant's Motion for Summary Judgment on Count II will be granted.

## VI.

In Count III, Plaintiff alleges interference with protected activity. ECF No. 14 at PageID.161. Specifically, Plaintiff alleges that CMU interfered with Plaintiff's requests for reasonable accommodations, through the actions of Silkwood-Sherer, L'Hommedieu, and Plaintiff's professors. *Id*. Plaintiff's second Amended Complaint states that CMU discriminated against her by:

> a. Deliberately interfering with the accommodations process as described in Count I of this Complaint; b. Issuing an unfounded written disciplinary warning based solely on Plaintiff's attempts to request accommodations; c. Scrutinizing the academic performance and attendance of Plaintiff more than other students; d. Interfering with Plaintiff's clinical placements; e. Engaging in abusive verbal behavior; f. Attempting to coerce Plaintiff to forego an accommodation to which she was otherwise entitled; g. Intimidating Plaintiff from requesting accommodations by indicating that such a request would result in Plaintiff's dismissal from the program or inability to find a job; h. Disparaging Plaintiff to others; i. Threatening and/or discouraging Plaintiff to refrain from consulting with an attorney regarding her rights under the ADA and Rehabilitation Act; and j. Other actions to be revealed during discovery. *Id*. at PageID.162.

Plaintiff cites the ADA and 42 U.S.C. § 12203 as the foundation of her claims. *Id*. at PageID.24.

42 U.S.C. § 12203(b) states:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

The Sixth Circuit has not articulated a test for an interference claim, but several other circuit courts have.

The Ninth Circuit in *Brown v. City of Tucson* found that there was a cognizable test for interference under the ADA in the employment context. 336 F.3d 1181 (9th Cir. 2003). The court cited a passage from a Congressional Committee report shortly before the passage of the ADA stating "The Committee intends that the interpretation given by the Department of Housing and Urban Development to a similar provision in the Fair Housing Act ['FHA'] . . . be used as a basis for regulations for this section." *Brown v. City of Tucson*, 336 F.3d 1181, 1191 (9th Cir. 2003). The court concluded that because the language of the ADA adopts the language of the FHA, "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by [the Act]," that the ADA is intended to be interpreted the same way. *Id.* Ultimately, the Brown court dismissed the claim and did not decide the issue.

In *Frakes v. Peoria School District No. 150*, the Seventh Circuit not only agreed with the Ninth Circuit that a cognizable test for interference under the ADA existed, but also listed the specific requirements of the test. The Seventh Circuit states that to prove an ADA interference claim that the Plaintiff must show that "(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate. *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017).

The Third Circuit found that the language of the ADA and section 8(a)(1) the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), are similar. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 570–71 (3d Cir. 2002). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees" in exercising their rights guaranteed

under the Act. *Id.* Therefore, Third Circuit held that plaintiffs may assert third-party retaliation and interference claims under the ADA, just as third-party claims may be made under the NLRA. *Id.* To prove NLRA interference in the Third Circuit, plaintiffs must show only that an employer's conduct may reasonably have coerced or induced employees to refrain from NLRA protected activity. *U.S. Steel Corp. v. N.L.R.B.*, 682 F.2d 98, 101 (3d Cir. 1982).

In *Fogleman*, the Third Circuit was primarily addressing the question of whether the ADA protection extended to third-parties as NLRA protection extends to third-parties. *Fogleman*, 283 F.3d at 564. Since the issue here is a first-party interference claim as analyzed in the Seventh and Ninth Circuit, and the Seventh Circuit developed a specific test for ADA interference, the Seventh Circuit's test will be applied.

Plaintiff alleges that CMU, through Dr. Silkwood-Sherer, interfered with the accommodations process by limiting those who could be involved in the interactive process, intimidated Plaintiff during the interactive process meeting, and changed the process by which Plaintiff was to seek accommodations. The first element is met since Plaintiff engaged in protected activity (seeking accommodations). The second element is met since Plaintiff was engaged in the protected activity when Dr. Silkwood-Sherer's alleged actions occurred. While Plaintiff was told not to bring a lawyer to the interactive process meeting, such a limitation is in line with the informal nature of the ADA's interactive process meetings and thereby not interference. ECF No. 47-27 at PageID.3704. Further, Plaintiff was told during the meeting that she could bring anyone who was not a lawyer to function as an advocate if she did not feel comfortable. *Id.* at PageID.3706. This allowance by CMU shows that the decision to exclude legal counsel from an informal meeting was not motivated by discrimination or the intent to coerce, threaten, or intimidate her about engaging in the interactive process. Dr. Silkwood-Sherer's comment, that those who ask for unreasonable

accommodations may not be hired, referred to her concern for Plaintiff in other environments if Plaintiff did not at least appear to be willing to compromise with future employers. Dr. Silkwood-Sherer's comment was made once and did not necessarily imply an effect on Plaintiff's experience and opportunities at CMU. Dr. Silkwood-Sherer's cancellation of Plaintiff's appointments with other professors to discuss class-specific accommodations were cancelled because the OCRIE was evaluating a universal set of accommodations as requested by Plaintiff. The meetings were not cancelled to harass or cause delay. As such, CMU, through Dr. Silkwood-Sherer's actions, did not interfere with Plaintiff's protected action of requesting reasonable accommodations pursuant to the ADA and Rehabilitation Act. CMU has met its burden to show there is no issue of genuine material fact that CMU did not coerce, threaten, intimidate, or interfere with Plaintiff's protected activity and CMU's actions were not motivated by an intent to discriminate. Therefore, Defendant's Motion for Summary Judgment on Count III will be granted.

## VII.

In Count IV, Plaintiff alleges CMU created a hostile education environment. ECF No. 14 at PageID.163. Specifically, Plaintiff alleges that CMU subjected her to "severe, pervasive, and objectively offensive unwelcome harassment based on her disability" thereby "creating an educational environment that has the purpose or effect of unreasonably interfering with the individual's performance." *Id.* at PageID.164. There does not appear to be a claim of "hostile education environment" cause of action recognized by Sixth Circuit.

However, under Title IX there is a claim for Abusive Education Environment. Plaintiff must show that her education was "severe[ly] or pervasive[ly]" affected either by "term, condition, or privilege." *Doe v. Big Walnut Local Sch. Dist. Bd. of Educ.*, 837 F. Supp. 2d 742, 756–57 (S.D. Ohio 2011) (quoting *Klemencic v. Ohio State Univ.*, 10 F. Supp. 2d 911, 916 (S.D. Ohio 1998)).

Plaintiff must show an objective and subjective component. The objective component is that a reasonable person would find Defendant's conduct abusive. *Doe*, 837 F. Supp. 2d at 756–57. The subjective component is that Plaintiff must regard the environment as abusive. *Id.*

The Supreme Court has articulated five factors to analyze whether an abusive educational environment exists. These factors are 1) discriminatory conduct's frequency, 2) its severity; 3) whether conduct contained a physical threat or humiliation, 4) the degree to which conduct affected the student's performance, and 5) whether plaintiff sought psychological therapy as a result of the conduct. *Klemencic v. Ohio State Univ.*, 10 F. Supp. 2d 911, 916 (S.D. Ohio 1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 19 (1993)). No single factor is dispositive. *Id.* When an abusive education environment is created, the affected student usually experiences a diminution of their academic performance and ability to learn, or swiftly removes themselves from the environment. See *Hoffman v. Saginaw Pub. Sch.*, WL 2450805, at *7 (E.D. Mich. June 27, 2012); *Haines v. Metro. Gov't of Davidson Cty. Tennessee*, 32 F. Supp. 2d 991, 996 (M.D. Tenn. 1998); *E.M.J. v. Garrard Cty. Bd. of Educ.*, 413 F. Supp. 3d 598, 606 (E.D. Ky. 2019).

Here, Plaintiff does not allege that her scholastic performance dropped as a result of her requests for accommodation or the alleged acts of retaliation by CMU staff. Rather, Plaintiff maintained a 3.67 GPA. ECF No. 14 at PageID.152. Plaintiff contends that she is currently on medical leave, but this medical leave is taking place after a full semester in which her requested accommodations were granted. ECF No. 14 at PageID.152-153. Plaintiff claims that she intends to return to CMU once she is physically able to do so. *Id.* Plaintiff does not provide evidence that she was humiliated, received discrimination based physical threats, or that she required psychological therapy due to her experience at CMU. Without providing evidence that aligns with the factors set by the Supreme Court, Plaintiff is unable to establish the subjective component of

the abusive educational environment test. Since Plaintiff must meet both the subjunctive and objective components, the objective component need not be analyzed here. Therefore, there is no genuine issue of material fact that Plaintiff did not experience an abusive educational environment as understood by other district courts within the Sixth Circuit. Defendant's Motion for Summary Judgment on Count IV will be granted.

## VIII.

Accordingly, **IT IS ORDERED** that Defendant's Motion to for Summary Judgment, ECF No. 39, is **GRANTED**.

It is further **ORDERED** that Defendant's Motion to Exclude Expert Witness, ECF No. 29, is **DENIED** as moot.

It is further **ORDERED** that Plaintiff's Amended complaint, ECF No. 14, is **DISMISSED**.


Dated: August 10, 2020                                 s/Thomas L. Ludington
                                                       THOMAS L. LUDINGTON
                                                       United States District Judge